Rehabilitation Act, ADA, and First Amendment Retaliation Claims under Section 1983 Rehabilitation Act, ADA, and First Amendment Retaliation Claims under Section 1983 The facts and the record in this case are complicated, so before I begin in earnest, I'm just going to sort of briefly sketch through the background history as kind of a foundation for the argument. Officer Ian Heber was a decorated veteran of the UC Berkeley Police Force with 12 years, 12 1⁄2 years, of basically unblemished service prior to his termination. He was given a notice of intent to discharge on November 21, 1990, and he was actually terminated effective January 17, 1991, ostensibly for events that occurred on and around November 2, 1990, an attempt to serve warrants on his female companion, Tansina Joiner Fatemeh. After he was terminated, he challenged his termination according to the internal grievance procedures of the university. He proceeded to an arbitration. The arbitration lasted a long time. I guess that's one of the questions I would have is whether it goes all the way up. I think the arbitration lasts a long time, and then you wind up with something going up to the presidential panel or something like that. Yes. Do we necessarily regard that as a continuous single process, or is it? I'm thinking, of course, for some sort of tooling purposes. Yes, Your Honor. I think that it should be regarded as a continuous process. The history of the process itself was that I believe there were eight hearing days, but for various and disordered reasons, some of them having to do with my client's health, those eight hearing days were spread out over a period of five years. And the process itself was bifurcated between what you might call a liability and a remedy phase, but I don't believe there was any interruption in that process. I think it proceeded as a single grievance under a single sort of grievance file from start to finish, from May of 1991 to until the process was sort of finally given the stamp of final confirmation by the UC Berkeley Chancellor. On that point, Mr. Glackin, what was the nature of the grievance process? I mean, what was the original grievance? The original grievance was that he was, excuse me, was that his discharge was not justified by the reasons that were given by the people who fired him. He also advanced arguments in the grievance that he was being discriminated against on the basis of his disability, but the Court never had cause to make a final finding on that argument, although the Court did reject that argument, excuse me, the arbitrator, just to be clear. But the disability claim was part of the original promotion grievance? No. A different one? No, it's different. When he was originally terminated, when sort of the notice was given that he was going to be terminated and he was suspended and so forth, he had a promotional grievance ongoing. That was a separate process, and I believe that simply dropped off. I mean, I think it, I don't know what formal action was taken on it, but this was not a continuation of that process. After he was filed, excuse me, after he was fired, he filed a new grievance paper opening a new grievance process to challenge his termination. And that, of course, was before, that was when, roughly? I believe it was, it's 1991. He was terminated effective January 1791. I believe he filed the thing in March of 91. So in that grievance included the disability? Well, that did not include a claim for relief under any of the disability laws. He advanced as an affirmative defense in that case that, you know, what he said is, okay, first of all, the reasons they're giving for terminating me, you know, don't justify termination. They're not legitimate. And he said, second of all, excuse me, as an affirmative defense, they also discriminated against me based on my disability. What the arbitrator found in 1993 was the arbitrator said, okay, I'm. I'm sorry. I'm kind of lost on the affirmative defense. I thought it was his grievance. Sorry? I thought it was his grievance. You know, that's absolutely right, Your Honor. And I think that in the court of law, what he was arguing would not have been called an affirmative defense. Maybe an alternative ground for relief or something. An alternative argument. Okay. But it was. See, I mean, here's the heart of it. I understand how broad our law is with respect to equitable tolling. But this, I think everybody would recognize, is right on the end of the envelope. Because to me, what it does is to require a district judge to be clairvoyant. You know? I mean, so my ‑‑ I guess my real question is, if we said there was arguably enough to trigger at least a further look at equitable tolling, at the end of the day, is it going to get you anywhere? I mean, in other words, was there really in the grievance process, in the administrative process, an exhaustion having to do with disability? When you say exhaustion ‑‑ Well, your equitable tolling claim depends, I guess, upon there having been, as part of an administrative proceeding, exhaustion of the ‑‑ or an adjudication of the disability claim. Your Honor, I would actually respectfully disagree about that. I don't think it does. Under the California law of equitable tolling, all that is required is that basically that the claims you're advancing in the second case are sufficiently similar to the claims that were advanced in the first case that the defendant had noticed to gather and preserve evidence. I agree. But it has to be disability. I mean, there's a big difference between ‑‑ because the statute of limitations claim was applied to the Rehabilitation Act claim. Right? Yes. Yes. Correct. So it has to be similar in some respect to the disability claim. Doesn't it? Yes, although, again, I think similar in this context really just means that, you know, basically that the defendant wouldn't be sort of blindsided at the end of the day. Okay. Just to put it in a different way, if your grievance process involved a dispute about whether the termination was on account of the reasons that were actually given or not, disability was not part of that. I mean, it wasn't one of the reasons given. Correct. It was not a reason given by the university. Okay. If the word disability were never mentioned in that grievance, then you're going to lose on the equitable tolling issue, aren't you? Well, I think, if I can just step back for a minute, Your Honor, I think one of the things that's fair to keep in mind is they've actually advanced a collateral estoppel argument based on that grievance proceeding against his disabilities claims. I mean, they've actually ‑‑ Okay. Well, then your answer to my question is that it was part of the grievance process. That's all I'm trying to find out. Was it? Yes. The argument was advanced. So at the end of the day, if we were to reverse and send it back and say, okay, this can be revisited on the summary judgment or whatever, you're saying that there would be evidence before the court that it was adjudicated in the grievance process. I would ‑‑ because of the collateral estoppel argument, I would hesitate to accept the word adjudicated. But what I would say is that if you look at the 40‑plus page opinion of the arbitrator, there is ‑‑ Well, you want to give up your Rehabilitation Act claim? I mean, the equitable tolling? Because it's so on the margin anyway. You mean on the margin in the sense that the allegations are not very good? Well, yes. I don't want to give the claim up, Your Honor. I think that ‑‑ I do think that he did all he was ‑‑ he pled all he was required to plead under Cervantes. This isn't equitable tolling. It's not ‑‑ this is a relatively commonplace legal doctrine. I mean, it comes up in ‑‑ Well, I understand. But, you see, here the district court obviously got it right on the First Amendment statute of limitations issue. Right. Okay? No time did your client ever say, ah, but, you know, the same principle applies to the Rehabilitation Act claim that you improperly dismissed on statute of limitations grounds. So he didn't move to reconsider or call that to the court's attention or anything. I mean, district judges to me just aren't supposed to be, you know, some kind of mystical, you know ‑‑ When did your client get counsel? When did he get counsel? When was I retained or when did I become his lawyer? Well, at some point he filed a complaint pro se. Yes. And at some point he became represented? No. He was always pro se before the district court. Yes. Throughout the district court proceedings? Yes. Yes. Never represented in the district court. And he retained counsel after final judgment was entered? I was appointed by the pro bono panel. Okay. He's never actually retained counsel. You're the first and only lawyer, you and your firm, that he's had. But this is an ordinary pro per civil case, right? I mean, he's not ‑‑ he wasn't incarcerated. Right. It's not a prisoner case. Anything like that. He's well educated. He is very well educated. He's got a graduate degree from Berkeley. For whatever that's worth. Well, you know, ask me. I would say it's not worth much coming from Stanford. But, you know, the rest of the world would probably say it's worth quite a bit. So we're not talking about somebody for whom we ought to feel incredible sympathy. Well, no, Your Honor. I'm not ‑‑ we're not asking for sympathy. But, I mean, I think that notwithstanding that he's relatively well educated, he's not an attorney. He doesn't have a law degree. I think that even someone who had a law degree and who was admitted to the bar and who was, you know, trying their first case in a district court might get tripped up on this stuff. It is interesting, whether it's determinative or not, that even as a pro se, he was able to point out to the district court in a motion for reconsideration and get the district court to look at Cervantes and conclude that on a claim not related to rehabilitation, the First Amendment retaliation claim, for example, that he had pled enough. I mean, that is correct. He was able to do that, right? I would have to go back and look at those pleadings again. But I think ‑‑ Yeah. He represented himself the entire time. Right? Right. Although, just in the interest of utmost candor, I believe that he off and on had counsel in his arbitration. And he may have off and on had counsel in relation to those much earlier State court proceedings that were filed before this act. But I'm talking about before Judge Wilken. Right. Never been represented before Judge Wilken. He was adroit and able enough to file a timely motion for reconsideration and get the district court to focus on what he had pled in his complaint. And the district court turned itself around and said, you know what? You're right. You have pled enough to get you past the motion to dismiss. Am I right so far? That's correct. I mean, he did succeed in ‑‑ he did succeed in persuading the district court of that. Although, I believe that my recollection of those pleadings, and I'd have to read them again, is that there was a little bit more of a spontaneous recognition. I mean, I think he just said equitable tolling finally, either in his complaint or in his opposition or in his motion. And it was the district court who at that point had a little bit more of a spontaneous  But that's basically correct, Your Honor. I guess the follow-on question is the record seems to tell us that there was no Cervantes examination of the Rehabilitation Act slash discharge claim. Correct. Related to the 91 events. Correct. And that's part of your position here is that there should have been. Yes. Absolutely, there should have been. I feel like maybe I ought to move on to the First Amendment stuff. We'll talk about that for a few minutes, if that's okay. One of the, you know, sort of the second main issue in this case is the First Amendment retaliation claim in the Mt. Healthy defense. It's basically uncontested, at least for purposes of summary judgment and this appeal, that he made out a tribal issue of fact on the three core elements of a First Amendment retaliation claim, which are an adverse employment act, protected speech, and a causal nexus between the two. The only issue that is in front of us today is the Mt. Healthy defense. And I think that this is actually perhaps in comparison to the Rehabilitation Act argument, I think this is a much better argument for him, and I think he really deserves to win this one, because the central fact and the central fact that was ignored by the district court is that the Mt. Healthy inquiry asked, as a matter of causation, would he have been terminated despite the protected speech? I.e., if he had not spoken, would he still have been terminated? And Mr. Einheber comes to this Court and came to the district court in a very unusual position. He had an arbitrated decision that the reasons advanced by the university at the time of his termination, which are the same reasons advanced by the university in support of the Mt. Healthy argument, were insufficient to justify that termination. I don't think the Court really has to go much further than that to find that a rational trier of fact could weigh those two pieces of evidence. One, the reasons advanced by Officer Harrison, Chief Harrison, excuse me, in her short declaration, and two, the arbitrator's rejection of those reasons as a basis for termination and reject the Mt. Healthy defense. I think a rational trier of fact would be entitled to do that. How does, how do you get from one arbitrator, arbiter saying that the stated reasons don't justify termination to a second arbiter saying you can't be reinstated? Well, that partly goes back to the disability issue, and it partly goes to other issues. What happened is, so there was a first arbitration in which he wins. It's put over for remedy phase. On the remedy phase, he goes in front of the second arbitrator. I believe there was further hearings and some further testimony in the remedy phase. First arbiter recused, didn't he? First arbiter recused himself. That's correct. And if you read the, there's a transcript that's in the supplemental, or excuse me, in our excerpts of record, or perhaps it's in there, actually. Maybe, I think it's an exhibit to Joyce Harlan's declaration that is the transcript of arbitrator Winograd's rejection of the remedy of reinstatement. And I believe the reasons he gives are, the main reason he gives is that he believes that Officer Einheber's conduct in the course of the arbitration demonstrates that he's not fit to be a police officer. By fit, are you speaking as physical or attitudinal? Attitudinal. He believes that to the effect that Officer Einheber's, you know, sort of the adversarial relationship that has, you know, sort of developed in the course of the arbitration between Officer Einheber and the command level management and Officer Einheber and the police department is simply, you know, sort of not reconcilable with Officer Einheber being reinstated. I'll just move, I'll just move on then very briefly to the last argument, which is the summary judgment on the Rehabilitation Act and ADA claims arising from post-termination conduct. And here the argument is all about the futile gesture doctrine. And the question is, is someone in Officer Einheber's circumstances, someone in his position required as a matter of law to submit on a reapplication for reinstatement in order to have a claim for disability discrimination? I believe that under the futile gesture doctrine, the answer is no. This is exactly the essence of the futile gesture doctrine. When someone knows that their application is going to be denied, they don't have to resubmit it. And I think the arguments advanced by the defendants, by the police, that maybe that there's no proof that the application would have been rejected because maybe it would have gone in front of other people than the ones who were litigating his arbitration, I think that's just a specious argument. I think it's clear that if he had submitted an application for reinstatement, it would have been rejected on the basis of his disability because that was the position they were trying to make. Did he raise that in the district court? Did he raise the futile gesture doctrine? No, he did not, Your Honor. Anything like it? Well, like I don't have to reapply because these folks wouldn't hire me anyway? I think that in evaluating the two waiver arguments, it is actually helpful to go back to what did happen in the district court. If you read their motion for summary judgment, they only put two paragraphs on the whole issue of the ADA claims. They nowhere cite the elements of the ADA claims, and they nowhere say, you know, here's this case that says you've got to like he had to apply for reinstatement. If he didn't reapply, he doesn't have a cause of action. At the oral argument on the motion, the whole oral argument focused for the most part on other issues. And at the very end of the argument, if I recall correctly, counsel to defense basically said, oh, and by the way, there's this other problem, which is that he never applied for reinstatement. And so, therefore, he just doesn't have a claim. And then, you know, three months later, you get the decision, and that's what it's all about. But it's not like there was, you know, an intense opportunity for the district court to consider this issue. It was really kind of a backhand issue in that motion. And so I don't think it's fair to lay, and I would say the same thing about the first issue on waiver. I don't think it's fair to lay all the blame at Officer Ryan Evers' feet. And your clock is probably showing the same thing that my clock shows, which is that I'm out of time. So thank you very much. Thank you, Mr. Blacken. Mr. Warrenson. Good morning. May it please the Court. My name is Mike Lorenzen. I'm Gordon and Reese on behalf of defendants and appellees, Regents of the University of California, and Chief Victoria Harrison. Your Honor, it's first to speak to the district court's decision in 1998 dismissing the Rehab Act claim based on the 1991 termination. I think, in a number of your questions, you hit on the central issue with this, and that was that Mr. Einhaber is a smart man, and this was one of several lawsuits. The difficulty is that the complaint, in fact, alleges in paragraph 11 that there was, in fact, a grievance proceeding of some sort going on with respect to his termination. It certainly does. It certainly does. Why isn't that enough under Cervantes? Well, because if you look at Cervantes and you look at the other cases that they rely on, there's a lot more alleged in those cases. Well, no, but it's a matter of, you know, establishing the principle. I mean, it is alleged here. It's just a little sparser. It is alleged, and it is sparse, and it is vague, and it is a bit obtuse, and it would require almost clairvoyance to determine the potential relevance to the allegations that were being made, and I'll tell you why. Because Mr. Einhaber, for whatever reason, chose to make this particular lawsuit, as in 1996, in conjunction with his grievance hearing process and his alleged desire to become readmitted. That's what this Rehab Act claim was about. According to Mr. Einhaber, if you look at his complaint, that's what this lawsuit and this Rehab Act claim was about. And that's why, when the Court parsed out the 1991 termination Rehab Act claim, there wasn't any complaint from Mr. Einhaber. And that's why, when the First Amendment retaliation claim showed up without leave of court in one of the amended pleadings, there was a whole analysis of it, because that was the first time anybody had ever heard about First Amendment retaliation. So there was an analysis there, and there was subsequent pleading, and there was a lot more detail on the grievance process, and everybody understood at that point what was going on and could see more clearly the potential applicability of equitable tolling. But in the very beginning, when this case was filed, the only person in that courtroom that really understood what went on in that long and slightly convoluted grievance process was Mr. Einhaber. And he didn't complain when the 1991 claim was parsed out because he made this lawsuit about 1996. It was his choice. And so this Court shouldn't get involved now in an exercise of its discretion because pro bono counsel has noted some nice legal argument that wasn't raised at the time to relieve Mr. Einhaber of that choice. It was a choice. And everything else the Court did from that point on, the district court, was bending over backwards in deference to Mr. Einhaber. Is it correct that the district court never conducted an equitable tolling analysis as to the Rehabilitation Act? Absolutely correct. Never considered it. Never went into it. So we don't know, for example, if even if you accept the notion that from the moment he filed in 91 until the end of things in 96, there was sufficient tolling to get around the 1-year statute? Well, I think we can assume what the result would be since the Court got there subsequently. The question is simply, because isn't it correct that because there was no equitable tolling analysis as to that claim, we don't know if there was enough time tolled or not? It is correct. It was not analyzed at all. It could be that if the case, if the case were remanded, that the Court could look at it and say, even accepting your argument that this tolls, you're still short of time. That is correct. And so because I don't think this Court should get involved now in exercising its discretion to relieve Mr. Einhaber of that choice he made in the district court on that claim, I'm going to move. I don't think that equitable tolling is a very strong argument, and I'm going to move on to the First Amendment claim because I think that's the more important argument. Did the Court apply Mount Healthy or McDonnell-Douglas? The Court absolutely applied Mount Healthy. And I think if you read the district court's motion for summary judgment in the excerpts of record tab O at page 13 where the district court begins the First Amendment analysis, I don't think it could be much clearer. I mean, it went right through the Mount Healthy steps as subsequently articulated in the Umber case and as adopted by this Court and articulated even further in the Kaiser case. The Court said, first, Mr. Einhaber must demonstrate protected speech even though he hasn't put forth any evidence whatsoever. I'm going to credit what he did on the motion for reconsideration because he's a pro se litigant and the university doesn't oppose it. So let's move on to Step 2. He has to show a substantial – he has to show – produce evidence that suggests that the speech was a substantial motivating factor in the decision to terminate him. They can do that by proximity, can't they? They can do that by proximity. Actually, what the Court did was it looked to this Court's decision in Kaiser and said, this is the way you can do this. There are a bunch of ways to do it. One of is temporal proximity. Another one is that the person, in this case Chief Harrison, spoke out against the speech. The district court found that that hadn't happened. And the other one, where it gets a little confusing, is that the third way to do it is by demonstrating pretext. So that's why there was a pretext discussion in the opinion because this Court recognized in Kaiser that that's one of the three ways to get to substantial factor. But hasn't our definition, this circuit's definition of proximity changed, expanded since Judge Wilken entered judgment? Well, I'm not sure of that, Your Honor. I'm actually not aware of that. But I don't know if that matters to this case because, I mean, this – the district court found temporal proximity as to one of the instances of speech. I would suggest a couple things. Didn't the district court find that some of the speech was not proximate in time? The district court did. The district court excluded some of the speech because it found it was too remote in time. And that's one of the issues they raised on appeal. And I frankly believe that that's just a red herring. Because if you assume that he has proven a sufficient causal nexus between one instance of speech and the university then steps in and says, okay, pursuant to Mount Healthy, the burden's now on us. And we have to show that he would have been dismissed regardless of his speech, regardless of any speech. In other words, the university's showing at that point is independent of any kind of speech. It's completely independent. So it doesn't matter how many instances. How far out in time was the speech that she excluded from consideration based on proximity? They weren't much further. I think the furthest out one was 1987, perhaps. The record was a little murky because, again, bear in mind Mr. Einhaber didn't submit any evidence of any speech. So the district court was somewhat reading between the lines and putting the evidence together itself to try and figure out when some of these things occurred. If you read the district court's opinion, you see how the court kind of did its own investigation in some cases to find out when particular speech occurred. But I think the oldest was perhaps 1987. And the court found that that was too old. Didn't she specifically say that an item of speech that was more than six months old wasn't proximate? The court may have, Your Honor. Haven't we said since then that three to eight months is proximate enough? I'm not aware of that. But taking that as a fact, that is irrelevant in this analysis because the court found that some of the speech was recent enough. So that analysis is then done. So we move on to the next step. And that's the university's burden to show that he would have been terminated regardless of his speech, regardless of any speech. And when you look at that, the evidence submitted in the district court was undisputed. There was no effort by Mr. Einhaber. There was no evidence presented eroding or showing that the reasons submitted by the university were false. Well, there's one piece of evidence that may be, I recognize that he didn't submit any evidence saying, well, the incidents, the November incidents didn't happen or they were really proper even though the university thought they weren't or blah, blah. But he did put in some evidence that Harrison said almost immediately upon her becoming chief that she'd get rid of him within a month. Why doesn't that raise a tribal issue on whether the university's reasons are actually the reasons? Well, I believe because that was hearsay and it was excluded because it was in the form of a declaration of a third person. And so it was unverified. Sorry, I don't understand that. I think the method by which Mr. Einhaber attempted to get this speech in front of the district court was by way of an unverified, potentially even unsigned declaration of a third party. Someone who said that she heard the defendant say something? Something that said that she heard the chief say that, yes. It was the defendant. Correct. What's hearsay about that? It's admission by a party. Well, the problem is, is that you have the way it's being conveyed to the court is in this purported declaration of someone who is unrelated to the action. And it was, I believe, unsworn. I just don't understand that. Okay. I mean, I may be wrong, but it's a declaration. It's under oath. It's submitted. Well, that's what I'm saying, Your Honor. It wasn't a declaration under oath. Okay. I'm sorry. I misunderstood you. Yeah. There were problems with that declaration. I don't know if it was under oath. I don't know if it was signed. There were questions about its authenticity. There were problems. That's my point. There were problems with the way that Mr. Einhaber sought to get this alleged comment in front of the court. And I believe the court ultimately did not consider that comment. Your opponent said that one of the things that's wrong with the university statement, that, well, he would have been fired anyway, is the arbitrator's conclusion that it wasn't enough for firing. And I think that's the most important thing for this court to consider, and I did want to get to that, because the arbitrator's decision is very important, because the arbitrator did not find that termination was inappropriate because other people, because there had been disparate treatment. The arbitrator rejected Mr. Einhaber's disparate treatment claim, considered it and rejected it. So Mr. Einhaber's claim that I was treated differently than other officers, that other officers did worse things and weren't fired, was considered and rejected by the arbitrator. The arbitrator also considered and rejected Mr. Einhaber's claim that he was terminated because the department wanted to, quote, get rid of him, considered and rejected that claim. The arbitrator also considered and rejected Mr. Einhaber's claim that disability discrimination had something to do with it. So the arbitrator's decision does not give any support for Mr. Einhaber's position here, that there's something about that decision that calls into question the university's First Amendment position. And also bear in mind, Mr. Einhaber demonstrated substantial motivating factor by what I would believe would be the weakest method, and that would be temporal proximity. He didn't have evidence of Chief Harrison speaking out against Mr. Einhaber. He didn't produce evidence of pretext. He demonstrated it by temporal proximity. And what distinguishes this case from most, perhaps all, temporal proximity cases is that the reason Mr. Einhaber was terminated was an intervening event between the speech and the termination. There was speech in 1990, there was Mr. Einhaber's conduct on November 2nd, and then there was his termination 21 days later. Your argument is that the first arbitrator's conclusion that termination was not warranted, if I can use loose language, doesn't erode or doesn't establish pretext. It does not. It doesn't help in that regard. It does not. Because what you also have to keep in mind, which is clearly laid out in the arbitrator's decision, is that's the arbitrator's decision. The arbitrator's decision was that the university, in my opinion, didn't take into account sufficiently enough what I believe are motivating factors, that his girlfriend was very ill, that he had been a wonderful officer up to that point. The arbitrator didn't look at the university's asserted reasons for the termination. The arbitrator didn't say, hey, people have lied to the Oakland police before and not been terminated. He didn't get to the reasons asserted by the university, and it's those reasons that are the support for the Mount Healthy defense. And also, bear in mind that in Silver's decision, which is at tab O in the excerpt, I'm sorry, which is at supplemental excerpts of record tab 8, in Silver's decision, he also relates that Chief Harrison was counseled by her senior staff that Mr. Einhaber should be terminated. He also relates that subsequent to Mr. Einhaber's termination, there was a Skelly hearing in which Chief Harrison's boss, Vice Chancellor Encino, upheld the termination. Suffice it to say, there's not a stitch of evidence in the entire record that erodes or calls into question the university's asserted reason for terminating Mr. Einhaber, or a stitch of evidence that suggests that he would not have been terminated but for his speech. And the arbitrator's decision supports the university's position here. Finally, just a minute about the ultimate dismissal of the Rehab Act claim. I'm going to give that about the same amount of time I gave it in the district court, which counsel believes was insufficient, and I'll tell you why. Feudal gesture and rehabilitation and ADA analysis simply don't have anything to do with the factual posture of this case. What Mr. Einhaber's claim is, so we all understand, is that they argued against, they presented evidence in the context of my grievance hearing that I wasn't medically fit to come back, and I believe I was medically fit to come back, and I never got a chance to come back. That's what this claim is about. Well, let's understand what happened. The university presented that evidence, arbitrator Winograd found it credible, and arbitrator Winograd, in addition to concluding that because of Mr. Einhaber's attitude, he wasn't fit to come back to the department, also concluded, also accepted that evidence and found that Mr. Einhaber wasn't medically fit to come back to the department either. Okay? So the end result was arbitrator Winograd saying, I understand what arbitrator Silver said, but because you're not attitudinally or medically fit to come back to the department, what I'm going to do is convert it to a long-term leave and ultimately a medical separation. So the result of Mr. Einhaber's grievance was that the university was never ordered to do anything. The university never reconsidered anything. There was no decision. There was no adverse action. There needed to be no application. Futile gesture does not apply. There is no employment decision here. The university terminated Mr. Einhaber for reasons unrelated to his disability and was never ordered to reconsider that decision. So the ADA simply doesn't apply. There's no employment decision here. There was never, the university was never asked to reconsider its decision, and its first decision had nothing to do with Mr. Einhaber's disability as arbitrator Silver found. So unless the Court has further questions, I'll conclude. All right. Counsel, thank you very much for your argument. The matter just argued. Thank you. Next, your argument in Dodson v. Western Investment. Thank you.
judges: Canby, Rymer, Hawkins